# Exhibit F




December 31, 2019

**IPR Branch**
Regulation and Rulings
Office of Trade
U.S. Customs and Border Protection
90 K Street, N.E., 10th Floor
Washington, D.C. 20229-1177

**Juan J. Porras**
Director, Machinery Center of Excellence
U.S. Customs and Border Protection
109 Shiloh Dr. Suite 300
Laredo, TX 78045

*Filed via ACE Protest Module*

**RE:** **Administrative protest of exclusion decision filed in accordance with section 514(a)(4), Tariff Act of 1930, as amended (19 U.S.C. 1514(a)(4)), and 19 C.F.R. § 174,** regarding Customs exclusion decision pursuant to Limited Exclusion Order, U.S. International Trade Commission Investigation No. 337-TA-1088, *Certain Road Construction Machines and Components Thereof*

Pursuant to 19 C.F.R. § 174, Wirtgen America, Inc., as consignee, represented by the undersigned counsel, respectfully submits this protest against an exclusion decision of the Director of the Machinery Center of Excellence, Juan J. Porras, issued on December 27, 2019. The decision excludes one road milling machine with serial number 18101094 (the 18101094 machine) that has been modified to use a design found not to be covered by claim 19 of the '693 patent (the Modified 1810 machine). Wirtgen presented the machine at the port of Baltimore, Maryland. Customs erroneously determined that it is subject to the limited exclusion order (exclusion order) issued by the U.S. International Trade Commission (Commission) in Investigation No. 337-TA-1088 (the 1088 investigation).

Timing for review of this protest is governed by **19 C.F.R. § 174.21(b)** ("within 30 days from the date the protest was filed"). The exclusion decision subject to this protest is that referenced in Exhibit 2, identified as follows:

| | |
|---|---|
| **Entry Number:** | SCS-77482413 |
| **Protestant/ Consignee:** | Wirtgen America, Inc.<br>6030 Dana Way<br>Antioch, TN 37013-3116 |
| **Importer Number:** | 62-1250621TN |
| **Bill of Lading:** | WLWH-DE2013112 |
| **Description of Merchandise:** | Wirtgen Cold Milling Machine,<br>W 120 XFi, Serial No. 18101094 |
| **Vessel/Airline:** | TYSLA CF933/WALLENIUS<br>WILHELMSEN LOGISTICS<br>AMERICAS |
| **Date of Arrival:** | December 3, 2019 |
| **Date of Detention:** | December 5, 2019 |
| **Date of Denial of Entry** | December 27, 2019 |
| **Port / Code:** | Baltimore / 1303 |
| **Customs Officer:** | Juan J. Porras<br>Director, Machinery Center of<br>Excellence and Expertise<br>U.S. Customs and Border Protection<br>Laredo, Texas |

# TABLE OF CONTENTS

I. Introduction ................................................................................................................ 4

II. Background ................................................................................................................. 4

III. Relevant ITC Findings ............................................................................................... 5

    A. Customs is bound by all legal and factual findings of the Commission ................ 5

    B. The Commission's legal and factual findings with respect to claim 19 ................ 5

    C. Rotating the yoke of the swing leg of the modified 1810 machines does not rotate the lifting column ................................................................................................ 8

IV. Customs Failed to Analyze Infringement ............................................................... 11

V. The 18101094 machine does not infringe claim 19 ............................................... 12

    A. The Bitelli SF 102 C swing leg does not meet claim 19 ...................................... 12

    B. The Modified 1810 machines do not infringe claim 19; they incorporate the same features that the FID analyzed for the Bitelli SF 102 C machine ........................ 12

VI. CBP Lacks Authority to Exclude the Modified 1810 machines .............................. 21

    A. CBP must accept Wirtgen's certification and allow entry of the Modified 1810 machines ............................................................................................................. 21

        1. The plain language of the exclusion order permits Wirtgen to certify that the Modified 1810 machines are not excluded by paragraph 1 of the order ......... 21

        2. As to certifications, Customs has only procedural discretion, which it did not exercise ....................................................................................................... 22

        3. Customs may not restrict the use of the certification provision to instances of prior adjudication by Customs or the Commission ........................................ 22

    B. The exclusion order cannot apply to the 18101094 machine because it only excludes road construction machines that the Commission found to infringe ..... 23

        1. The exclusion order plainly applies to adjudicated machines only, as the Commission may only exclude unadjudicated articles under Section 337(e) . 23

        2. Customs improperly applied *Auer* when it relied on Commission statements to interpret the exclusion order ................................................................................ 24

        3. The exclusion order cannot reasonably require Customs to violate the law by construing claims and determining infringement ........................................... 26

    C. Customs may not place the burden of proof on Wirtgen ..................................... 26

VII. Conclusion ............................................................................................................... 28

Table of Exhibits ............................................................................................................. 30

# I.    INTRODUCTION

Customs must allow the Modified 1810 machines, including the 18101094 machine, to enter the United States for three independent reasons. First, during the 1088 investigation, the Commission made an affirmative finding that a swing leg design substantially identical to that used in the Modified 1810 machines does not fall within the scope of claim 19. Specifically, the Commission found that a swing leg having a lifting column and yoke that are rotationally decoupled does not meet the limitations of claim 19. That finding is binding on Customs. As shown below (and previously presented to Customs), the Modified 1810 machines have a swing leg whose lifting column and yoke are rotationally decoupled. Accordingly, Customs must acknowledge that the Modified 1810 machines are not subject to the exclusion order.

Second, Wirtgen has submitted a certification that satisfies the terms of the exclusion order. Customs must accept that certification. Customs may not rely on non-binding Commission statements to interpret the certification provision because the plain language of the certification provision is clear. Wirtgen may certify that the products are outside the scope of paragraph 1 of the exclusion order.

And third, Customs acted unlawfully in requiring that Wirtgen prove non-infringement of the 18101094 machine. The only reasonable reading of paragraph 1 of the exclusion order is that it excludes only those machines that the Commission found to infringe. It does not purport to exclude products that the Commission has not adjudicated, and interpreting it to do so would be unreasonable for three reasons: (1) the Commission's authority extends only to adjudicated products; (2) due process, the Administrative Procedure Act, and binding precedent do not allow shifting the burden of proof; and (3) Customs could not enforce such an order because it does not have authority to adjudicate infringement in the first instance. Customs' reading of the exclusion order, therefore, is unreasonable and contrary to law.

In addition, Customs can and should allow the imports in view of the recent final written decision of the Patent Trial and Appeal Board invalidating claim 19. *See Wirtgen America, Inc. and Joseph Vogele AG v. Caterpillar Paving Products Inc.*, IPR2018-01201, Final Written Decision (Dec. 13, 2019) at 35.

# II.    BACKGROUND

Complainants Caterpillar Inc. and Caterpillar Paving Products, Inc. filed a complaint that led to the 1088 investigation asserting, *inter alia*, U.S. Patent Nos. 7,140,693 (the '693 patent). The ALJ conducted an evidentiary hearing on September 25 and 26, 2018, and issued a Final Initial Determination (FID) finding a violation of section 337 on Feb. 14, 2019. The FID found all the asserted claims invalid except claim 19. Specifically, the FID found that claims 1, 15, 16, 17, 18, 24, 26, 27, 28, 36, and 38 of the '693 patent are anticipated by the Bitelli SF 102 C machine, and claims 1, 15, 16, 17, 18, 24, 26, 27, 36, and 38 of the '693 patent are obvious in view of the Bitelli Volpe SF 100 T4M machine and U.S. Pat. No. 3,633,292 to Ulrich. FID at 84. The FID also found that the Wirtgen W 100 CFi, W 120 CFi, and W 130 CFi road milling machines (collectively, the "Series 1810" machines), infringe claim 19. Thus, the ALJ recommended that the Commission issue a limited exclusion order and cease-and-desist order against Wirtgen. The Commission affirmed the ALJ's determination in relevant part and issued

the recommended remedies against Wirtgen's Series 1810 machines. Wirtgen timely appealed the Commission's decision, and that appeal remains pending.

On September 5, 2019, Wirtgen provided Customs with notice that it would be importing a *Modified* 1810 machine on September 9. Wirtgen also provided extensive detail regarding the operation of Wirtgen's Modified 1810 machines and legal analysis demonstrating that the Modified 1810 machines are not subject to the exclusion order. Customs allowed that Modified 1810 machine and subsequent Modified 1810 machines to be imported. But now, Customs is excluding the 18101094 machine without any consideration of Wirtgen's evidence or providing any showing that this machine is covered by claim 19.

## III.    RELEVANT ITC FINDINGS

### A.    Customs is bound by all legal and factual findings of the Commission

Section 337 tasks the Commission with determining the scope of asserted patent claims in order to determine whether imported articles infringe those claims. 19 U.S.C. § 1337(a)(1)(B). The Commission then may direct that "the articles concerned … be excluded from entry" and "notify the Secretary of the Treasury" who "shall, through the proper officers, refuse such entry." *Id.* at § 1337(d)(1). According to its statutory role, "CBP is bound by the ITC's findings as they relate to section 337 and shall refuse entry as directed." *See* 19 U.S.C. § 1337(d); CBP HQ Ruling H200715 at 8 (Oct. 23, 2013). Thus, Customs accepts all legal and factual findings of the Commission:

> we treat all determinations of the Commission, including any conclusion of law or finding of fact, that arise from an investigation or related proceeding, as binding authority, and we apply these determinations with preclusive effect.

CBQ HQ Ruling H295697 at 29 (July 20, 2018).

### B.    The Commission's legal and factual findings with respect to claim 19

The sole claim at issue, claim 19, depends from independent claim 17, which recites:

> 17. A method of controlling the position of at least one wheel or track of a plurality of wheels or tracks supporting a frame of a work machine, said at least one wheel or track being connected to a respective lifting column connected to said frame by a support arm, said lifting column being adapted to raise and lower said frame relative to the respective wheel or track, said method comprising the steps of:
>
> controllably actuating a first actuator to pivot said support arm relative to said frame to position said wheel or track between a projecting or retracted position relative to said frame, the projecting and retracted position forming an arc of at least 90°, and

> controllably <u>actuating a second actuator to position said wheel or track</u> in a selected rotational direction about a vertical axis of said wheel or track.

'693 patent, 10:43–57 (emphasis added). Claim 19 adds the further limitation:

> 19. The method of claim 17, wherein <u>positioning</u> said wheel or track in said rotational direction includes <u>rotating said lifting column</u>.

*Id.* at 10:63–65 (emphasis added). The parties agreed that the term "rotating said lifting column" should be construed to mean "rotating at least a portion of said lifting column." Order No. 28 (*Markman* Order) at 13. The ALJ adopted that claim construction. *Id.*; Comm'n Op. at 18–19.

The ALJ found that the Bitelli SF 102 C machine, having a yoke rotationally decoupled from the lifting column, did not anticipate claim 19. FID at 35–36. An annotated photograph of the Bitelli SF 102 C, provided by Caterpillar's own expert and relied on in the FID, is reproduced below, and videos of the same can be seen at RPX-0358C.mov; RPX-0519C.mov; RPX-0659C.mov.[1] *See* FID at 35 (citing CDX-0003.30).

---

[1] Customs has access to these videos as part of the Commission record in Inv. No. 337-TA-1088. Additionally, a courtesy copy was provided to Customs IPR Branch on September 5, 2019.



FID at 35 ("steering cylinder" annotation added).

The FID found that the scope of claim 19 did not include the swing leg of the Bitelli SF 102 C because "rotating the yoke [of the SF 102 C] … does not rotate the lifting column." FID at 36. Specifically, although the steering cylinder of the Bitelli SF 102 C (the "second actuator" of claim 17) positions the track in a selected rotational direction about a vertical axis of the track, that action does not rotate a portion of the lifting column. Rather, it rotates a separate structure: the yoke that connects the track to the lifting column. Because the yoke is *rotationally decoupled* from the lifting column, the yoke and track rotate without rotating the lifting column. FID at 36.

> The yoke of the Bitelli SF 102 C is different from the bracket described in the '693 patent…. Unlike the coaxial sleeve and bracket claimed as part of the lifting column in the '693 patent, the yoke in the Bitelli SF 102 C is a distinct structure that rotates the tracks on a separate axis from the lifting column. *Rotating the yoke in the Bitelli SF 102 C does not rotate the lifting column, and accordingly, claim 19 is not anticipated.*

FID at 35–36 (emphasis added). This rotational decoupling is readily confirmed by visual inspection. As can be seen in the Commission record at RPX-0519C.mov (and detailed in photographs below), there is a keyway that runs vertically along the lifting column (the red line representing the axis of the lifting column in the annotated photograph above runs through the middle of that keyway). When the track is steered, the keyway remains in the same position

relative to the frame, demonstrating that the lifting column *does not rotate* when the steering cylinder extends or retracts.

The ALJ's factual and legal findings regarding the scope of claim 19 in the invalidity context have preclusive effect in the infringement context. "[J]udicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity or infringement." *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983). This follows because both infringement and invalidity require first construing the claims and then comparing them to a reference, whether accused product or prior art. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316 (2015) ("Determining infringement requires two steps: construing the claims and comparing the properly construed claims to the accused product."); *Medichem, S.A. v. Rolabo S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) ("Both anticipation under § 102 and obviousness under § 103 are two-step inquiries . . . a proper construction of the claims … [and] a comparison of the properly construed claim to the prior art.")

Based on the ALJ's findings regarding claim 19 and the Bitelli SF 102 C, the Modified 1810 machines *cannot* infringe. The yoke of the Modified 1810 machines rotates without rotating the lifting column just as the Bitelli SF 102 C. A configuration that does not anticipate if earlier cannot infringe if later. *See Peters v. Active Manufacturing Co.,* 129 U.S. 530 (1889) ("That which infringes if later, anticipates if earlier."); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses. A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement."). Accordingly, Customs must find that, like the Bitelli SF 102 C, the Modified 1810 machines are outside the scope of claim 19 and of the exclusion order.

### C.     Rotating the yoke of the swing leg of the modified 1810 machines does not rotate the lifting column

The Modified 1810 machines are road milling machines that grind and remove an old layer of pavement in order to create a smooth and even surface on which to apply new pavement. A photograph of a Modified 1810 machine, serial number 18101069, is shown below, which is representative of all Modified 1810 machines including the 18101094 machine at issue in this Protest. Ex. 1, Schmidt Declaration at ¶¶ 15–16.



lifting column

steering actuator

yoke

track

*See* Ex. 1, Schmidt Declaration at ¶ 16.

As seen above, each of the Modified 1810 machines includes tracks (yellow) that propel the machine over the road surface. *See id.* A yoke connects each track to a lifting column that lowers and raises the machine frame to bring the milling drum into and out of contact with the road surface. *See id.* The rear-right track is steered by rotating only the yoke and track, not the lifting column. When the rear-right track is rotated for steering, the lifting column does not rotate. *See* Ex. 1, Schmidt Declaration at ¶ 19-25.

In addition, the rear-right track is connected to the lifting column that can swing out from the frame of the machine as needed. *See* Ex. 1, Schmidt Declaration at ¶ 16. This swinging lifting column configuration is commonly referred to as a "swing leg." *See* Ex. 1, Schmidt Declaration at ¶ 8. The photograph below shows the Modified 1810 machine with the swing leg in the extended position relative to the frame.



*See* Ex. 1, Schmidt Declaration at ¶ 16.

To permit milling close to an object like a highway barrier, curb, or wall ("flush milling"), the swing leg can be retracted. *See* Ex. 1, Schmidt Declaration at ¶ 8. The photograph below shows the Modified 1810 machine with the swing leg in the retracted position relative to the frame.



*See* Ex. 1, Schmidt Declaration at ¶ 16.

# IV.     CUSTOMS FAILED TO ANALYZE INFRINGEMENT

Customs excluded the 18101094 machine without making any findings as to infringement. Customs did not even determine whether the 18101094 machine excluded is like the prior Series 1810 that the Commission found to infringe or like the Modified 1810 machine, serial no. 18101069, about which Wirtgen submitted extensive non-infringement evidence. Instead, Customs found only that the 18101094 machine has a different serial number than the 18101069 serial number machine. Other than its serial numbers, Customs considered nothing about the 18101094 machine, or the evidence that Wirtgen submitted, before excluding it.

Customs may not determine infringement based upon model names and serial numbers alone—particularly when it has received evidence that the model names and serial numbers pertain to a new design. Customs relies, improperly, on a prior Commission opinion. The opinion cited states that the Commission does not limit its remedial orders to the "specific models selected."[2] Yet Customs accepts Wirtgen's evidence of non-infringement only as to serial number 18101069. *See* Ex. 2, Exclusion of Entry No. SCS-77482413 ('413 Exclusion) at 6 (determining to exclude because "the serial number of the machine described in the memorandum is different than the serial numbers of the above-identified articles"). Customs has advanced no basis for reading these inconsistent standards into the exclusion order, much less a "fair and considered judgment." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019).

Customs improperly ignored Wirtgen's evidence of non-infringement. Wirtgen twice explained, in person on August 13 and in writing on September 5, that the 18101069 machine was representative of future Modified 1810 machines. Customs simply ignored that fact. Wirtgen's memorandum also stated that future machines could be identified by their XFi suffix, and the 18101094 machine bears a model name "W 120 XFi." *See* Ex. 5, Memorandum at 1, n.1. Like all XFi models, the 18101094 has a swing leg that is identical to the 18101069 machine. Ex. 1, Schmidt Declaration at ¶¶ 15–16. Customs could have confirmed this fact with a simple visual inspection.

Wirtgen proved that the 18101069 machine (as representative of the Modified 1810 machines) does not infringe the '693 patent, and Customs failed to find otherwise. On September 5, 2019, Wirtgen explained in detail the operation of the swing leg in the Modified 1810 machines by sending a memorandum, which Customs received. *See* Ex. 2, '413 Exclusion at 4. That memorandum explained why the 18101069 machine, applying the Commission's findings, does not infringe claim 19. Those findings are binding on Customs.

Customs allowed the 18101069 machine to enter, yet excluded the 18101094 machine at issue in this protest without any consideration of the non-infringement arguments advanced by Wirtgen in the memorandum. If Customs lacked knowledge as to whether the excluded Modified

---

[2] Ex. 2, '413 Exclusion at 2, n.1, *citing Certain Optical Disk Controller Chips and Chipsets*, Inv. No. 337-TA-506, Comm'n Op. at 56–57 (USITC Pub. 3935) (July 2007) (EDIS Doc. No. 287263).

1810 machine had the same swing leg as the 18101069, that ignorance was willful. Indeed, Wirtgen repeatedly informed Customs that all of the Modified 1810 machines sought to be imported would have identical swing leg designs. And, to confirm this fact for itself, Customs needed only to look at the Modified 1810 machines and compare them to the Commission record and to Wirtgen's photos, videos, and drawings of the 18101069 swing leg. Even if Wirtgen bore the burden of proving non-infringement, Wirtgen met that burden. Customs only contested whether Wirtgen proved that the evidence applied to the machine it chose to detain—but Customs failed to identify any authority for requiring that showing. In fact, the CIT has held that where, as here, the Commission did not consider evidence of infringement, "Customs had to make a substantive determination that the [excluded products] infringe" a particular claim. *See Corning Gilbert Inc. v. U.S.*, 896 F. Supp. 2d 1281, 1290 (CIT 2013).

After detaining the 18101094 machine, Customs had 30 days to make that determination, and failed to do so. Customs may not now evaluate infringement in response to Wirtgen's protest. *See Corning Gilbert Inc. v. U.S.*, 896 F. Supp. 2d 1281, 1291 (CIT 2013) ("The 30 days allowed by the regulation to act on a protest provide time for the agency to explain the analysis and reasoning underlying the protested decision, not to engage in thinking about this decision for the first time.") Accordingly, Customs must release the 18101094 machine.

## V.     THE 18101094 MACHINE DOES NOT INFRINGE CLAIM 19

Claim 19 requires that the swing leg actuate a second actuator to position the wheel or track in a selected rotational direction by rotating at least a portion of the lifting column. The FID expressly found that the prior-art Bitelli SF 102 C does not satisfy this limitation. FID at 34–36. This finding applies equally to the 18101094 machine because the Modified 1810 swing leg uses the same design where rotating the yoke does not rotate the lifting column. Accordingly, the swing leg of the Modified 1810 machines, including the 18101094 machine, does not infringe claim 19.

### A.  The Bitelli SF 102 C swing leg does not meet claim 19

Milling machines use various mechanisms to (1) pivot the swing leg between the extended and retracted positions and (2) rotate the track about a vertical axis. *See* FID at 7–12, 31, 35–38, 43–45, 48–49. Claim 17 of the '693 patent recites the steps of (1) "controllably actuating a first actuator to pivot [the swing leg] between a projecting or retracted position relative to said frame" and (2) "controllably actuating a second actuator to position said wheel or track in a selected rotational direction about a vertical axis of said wheel or track." Claim 19 further requires that in step (2), the positioning in said rotational direction "includes rotating said lifting column." The FID found that the scope of claim 19 did not include the swing leg of the Bitelli SF 102 C because "rotating the yoke … does not rotate the lifting column." FID at 36.

### B.     The Modified 1810 machines do not infringe claim 19; they incorporate the same features that the FID analyzed for the Bitelli SF 102 C machine

With respect to the elements of claim 19, the swing leg of the Modified 1810 machines, including the 18101094 machine, is similar in structure and operation to the Bitelli SF 102 C swing leg. The steering cylinder is mounted between the lifting column and the yoke such that

upon actuation it rotates only the yoke and associated track; the steering cylinder does not rotate the lifting column. Ex. 1, Schmidt Declaration at ¶ 19. In addition, as shown below, the axis around which the track rotates is not coaxial with the axis of the lifting column. *Id.* at ¶ 17. The ALJ found that these features brought the Bitelli SF 102 C machine outside of the scope of claim 19, and that finding applies to the 18101094 machine as well. FID at 34–36. The Modified 1810 machines, including the 18101094 machine, do not practice the method of claim 19.

## Column and track rotate on different axes

### Cross-section of the lifting column and steering yoke



**Annotated drawing of the lifting column of the Modified 1810 machines.
Ex. 1, Schmidt Declaration at ¶ 17.**

The original Series 1810 design that was found to infringe claim 19 steered its swing-leg track via a hydraulic cylinder connected between the machine frame and a link-ring rotationally fixed to the lifting column, as shown in the computer model below. Ex. 1, Schmidt Declaration at ¶ 18. Consequently, actuation of the steering cylinder rotated the lower portion of the lifting column (shown in blue), thereby rotating the associated track. *Id.*; FID at 22. In other words, the track was rotationally coupled to the lifting column.



**Original Series 1810 swing leg: rotationally coupled.**
*See* **Ex. 1, Schmidt Declaration at ¶ 18.**

In contrast, the Modified 1810 machines steer their swing-leg track via a hydraulic cylinder connected between the yoke and a plate fixed to the bottom of the lifting column, as shown in the computer models below. Ex. 1, Schmidt Declaration at ¶ 19. Consequently, actuation of the steering cylinder rotates only the yoke (shown in blue), not the lifting column, to rotate the associated track. When extended, the hydraulic cylinder pushes against the fixed plate, thereby rotating the yoke and attached track to steer the track to the left. When retracted, the hydraulic cylinder pulls against the fixed plate, thereby rotating the yoke and attached track to steer the track to the right. Actuation of the hydraulic cylinder does not rotate any portion of the lifting column. The track and the lifting column are rotationally decoupled. *Id.*



**Modified 1810 machine swing leg: rotationally decoupled.**
*See* **Ex. 1, Schmidt Declaration at ¶ 19.**

Wirtgen previously supplied to the IPR Branch photographs and videos of a Modified 1810 machine, serial number 18101069. They show that the yoke and the lifting column are rotationally decoupled; the lifting column does not rotate when the track is steered by extension and retraction of the steering cylinder. *See*, *e.g.*, 1_side_wide.mp4; 2_side_tight.mp4; 3_angled_wide.mp4; 4_angled_tight.mp4; 5_elevated_wide.mp4; 6_elevated_tight.mp4. These photographs and videos are representative of the swing legs of all Modified 1810 machines, including the 18101094 machine. Ex. 1, Schmidt Declaration at ¶ 16.

The first two photographs (below) show the swing-leg in the retracted position[3] with the track steered to propel the machine straight ahead, i.e., with the track parallel to the frame. Ex. 1, Schmidt Declaration at ¶¶ 20-21. Two viewpoints are provided, one from the side and one from an elevated angle. Note that the lower portion of the lifting column includes a keyway. As shown below, as the steering actuator rotates the yoke and the associated track, the keyway remains in the same position relative to the frame, demonstrating that the lifting column does not rotate when the steering actuator extends or retracts.

_____

[3] The Modified 1810 swing leg does not steer in the extended position.



**Modified 1810 machine swing leg, unrotated (side view).**
*See* **Ex. 1, Schmidt Declaration at ¶ 20.**



**Modified 1810 machine swing leg, unrotated (elevated view).**
*See* **Ex. 1, Schmidt Declaration at ¶ 21.**

17

The next pair of photographs (below) shows the swing leg in the retracted position with the track steered to the left by retracting the steering actuator. Ex. 1, Schmidt Declaration at ¶¶ 22-23. Although rotated only a few degrees, this represents the maximum steering angle in this direction. Note that the keyway has not changed position relative to the frame.



**Modified 1810 machine swing leg, rotated left (side view).**
***See*** **Ex. 1, Schmidt Declaration at ¶ 22.**



**Modified 1810 machine swing leg, rotated left (elevated view).**
***See*** **Ex. 1, Schmidt Declaration at ¶ 23.**

The next pair of photographs (below) shows the swing leg in the retracted position with the track steered to the right. Ex. 1, Schmidt Declaration at ¶¶ 24-25. This represents the maximum steering angle in this direction. Note that, as with the straight and steered-left track positions, the keyway has not changed position relative to the frame.



**Modified 1810 machine swing leg, rotated right (side view).**
*See* **Ex. 1, Schmidt Declaration at ¶ 24.**



**Modified 1810 machine swing leg, rotated right (elevated view).**
*See* **Ex. 1, Schmidt Declaration at ¶ 25.**

The final set of six photographs below shows the series above, with the annotations removed. As can be seen, the keyway remains in the same location no matter whether the track is steered straight ahead, rotated to the left, or rotated to the right. This demonstrates that the rotation of the track is decoupled from the rotation of the lifting column.



| **Straight** | **Steering Left** | **Steering Right** |

*See* Ex. 1, Schmidt Declaration at ¶¶ 20–25.

The Modified 1810 machines, including the 18101094 machine, incorporate structural designs that do not fall within the scope of claim 19. The design of the Series 1810 that was found to infringe claim 19 utilized a steering cylinder extending from the frame to a steering ring rotationally fixed to the lifting column. The design of the Modified 1810 machines, like the deisgn of the SF 102 C, utilizes a steering cylinder extending from a plate fixed to the bottom of the lifting *column to a non-coaxial yoke*. By necessity, this design *rotationally decouples* the yoke from the lifting column, ensuring that the steering cylinder positions the track *without rotating* any portion of the lifting column. Accordingly, as the FID found, this design is outside the scope of claim 19.

## VI.   CBP LACKS AUTHORITY TO EXCLUDE THE MODIFIED 1810 MACHINES

### A.   CBP must accept Wirtgen's certification and allow entry of the Modified 1810 machines

#### 1.   The plain language of the exclusion order permits Wirtgen to certify that the Modified 1810 machines are not excluded by paragraph 1 of the order

The Commission's limited exclusion order states that "persons seeking to import road construction machines and components thereof, that are potentially subject to this Order may be required to certify that . . . the products being imported are not excluded from entry under

paragraph 1 of this Order." Ex. 3, Commission Exclusion Order at 3. Under the plain language of the order, Wirtgen officials need only affirm that "they are familiar with the terms" of the order, "they have made appropriate inquiry," and that they are certifying "to the best of their knowledge and belief." Wirtgen has done just that. *See* Ex. 4, Wirtgen Certification.

Wirtgen sought to import the 18101094 machine, which is a "road construction machine." After Customs detained that machine, Wirtgen officials certified that, to the best of their knowledge and belief, the 18101094 machine is "not excluded from entry under paragraph 1 of this Order." *See* Ex. 4, Wirtgen Certification. Accordingly, Customs must allow the Modified 1810 machines, including the 18101094 machine, to enter.

### 2. As to certifications, Customs has only procedural discretion, which it did not exercise

The plain language of the exclusion order provides Customs with discretion regarding *whether* to require a certification before permitting entry. It also allows Customs to establish procedures for submitting a certification. Ex. 3, Commission Exclusion Order at 3 ("At the discretion of [Customs] and pursuant to the procedures it establishes, persons . . . may be required to certify . . . "). Customs acknowledged receipt of the certification and has not identified any procedural problems with its submission. Ex. 2, '413 Exclusion at 4–5.

Accordingly, after an importer provides a certification that products are outside the scope of paragraph 1, CBP may only request "such records or analyses as are necessary to substantiate this certification." Wirtgen provided a certification to Customs through the ACE portal. Ex. 4, Wirtgen Certification. Customs did not request any substantiating records or analyses, and the 30-day period for determining admissibility has expired. *See* 19 C.F.R. § 151.16(e). Customs must now allow the Modified 1810 machines, including the 18101094 machine, to enter the United States.

### 3. Customs may not restrict the use of the certification provision to instances of prior adjudication by Customs or the Commission

Customs rejected Wirtgen's certification. Customs identified it as a "self-certification" and stated that it "will not accept a certification . . . absent a determination by CBP or the Commission that the article is not subject to the exclusion order." Ex. 2, '413 Exclusion at 5. As support for its interpretation of the exclusion order, Customs did not identify any statute, regulation, or provision of the exclusion order. Instead, Customs points to a Commission Opinion—not published in the Federal Register—from another investigation and purports to apply it to this exclusion order. *Id.* The Commission stated that "[t]he standard certification provision does not allow an importer to simply certify that it is not violating the exclusion order." *Id.*, *citing Certain Road Milling Machines and Components Thereof*, Inv. No. 337-TA-1067, Comm'n Op. at 15 n.5 (Aug. 7, 2019).

The Commission's statement in the 1067 Investigation about "the standard certification provision" cannot be used to interpret the exclusion order in the 1088 investigation because it does not qualify for *Auer* deference. The Supreme Court recently held that "[f]irst and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous" after exhausting "all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (2019) (citations

omitted). The certification provision is not ambiguous and plainly allows "self-certification." It allows importers to certify that "to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order." Ex. 3, Commission Exclusion Order at 3. Accordingly, *Auer* deference does not apply.

In addition, the Notice and Comment provisions of the Administrative Procedure Act prevent the Commission from using interpretive statements from other investigations to add to or modify the interpretation of the exclusion order in the 1088 investigation. Rather, to enact a general rule that adds binding terms to all exclusion orders, the Commission must comply with the notice-and-comment requirements of 5 U.S.C. § 553. *See, e.g.*, *Glycine & More, Inc. v. U.S.*, 880 F.3d 1335 (Fed. Cir. 2018) ("If Commerce wished to rewrite or amend the regulation, such a regulation intended to have the force of law must be adopted with notice-and-comment rulemaking, which was absent here."). In addition, the President recently ordered that agencies making enforcement determinations "must establish a violation of law by applying statutes or regulations." Executive Order 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, 84 Fed. Reg. 55239, 55240 (Oct. 9, 2019). The President also ordered that "[i]f an agency intends to rely on a document arising out of litigation" then "it must publish that document . . . in the Federal Register" or in a database of all guidance documents, "and provide an explanation of its jurisdictional implications." This is yet another reason why Customs may not interpret the exclusion order using the Commission's unpublished statements in other investigations. Accordingly, the exclusion order has no prohibition against self-certification, and Customs must accept Wirtgen's certification.

### B. The exclusion order cannot apply to the 18101094 machine because it only excludes road construction machines that the Commission found to infringe

The exclusion order excludes "road construction machines and components thereof that infringe claim 19 of the '693 patent." Ex. 3, Commission Exclusion Order at 2. The phrase "machines … that infringe" plainly means machines that the Commission determined to infringe in the underlying investigation. Customs improperly relies on Commission statements regarding exclusion orders in other investigations. Customs may not rely on such interpretations because they do not qualify for *Auer* deference. The exclusion order clearly includes only machines found to infringe, and an interpretation extending it to unadjudicated machines would be both unreasonable and unlawful—allowing Customs and the Commission to effectively issue a new exclusion order every time it interprets the existing exclusion order. In addition, it would circumvent the statutory requirements of Section 1337(e) regarding not-yet-adjudicated articles that *might* violate Section 337. Because the 18101094 machine has not been adjudicated to infringe, Ex. 2, '413 Exclusion at 3-4, it cannot be subject to the exclusion order.

### 1. The exclusion order plainly applies to adjudicated machines only, as the Commission may only exclude unadjudicated articles under Section 337(e)

The exclusion order is clear. It excludes "road construction machines and components thereof that infringe claim 19." Ex. 3, Commission Exclusion Order at 2. Consistent with the statutory scheme, the only reasonable interpretation of machines "that infringe" is that it extends to all machines that the Commission found to infringe. Machines "that infringe" does not mean

machines "that *might* infringe." If the Commission meant to exclude unadjudicated machines, it would have done so under the proper authority—Section 337(e).

Section 337 provides two forms of remedy: one for adjudicated articles, and one for unadjudicated articles. As to adjudicated articles, "[i]f the Commission determines . . . that there is a violation" then it can exclude "the articles concerned." 19 U.S.C. § 1337(d)(1). But if the Commission wishes to exclude not-yet-adjudicated articles, it may only do so temporarily using the authority provided under Section 337(e). That section provides two important procedural safeguards. First, the Commission must "determine[] that there is reason to believe that there is a violation of this section." 19 U.S.C. § 1337(e)(1). Second, the Commission must allow the articles to be imported under bond while it completes its investigation. *Id.*

The exclusion order in this case was issued pursuant to Section 1337(d). Therefore it applies to adjudicated articles, i.e., "the articles concerned," not to unadjudicated articles. The ALJ specifically found Wirtgen's redesigns to be outside the scope of the 1088 investigation, so they cannot be among "the articles concerned" or the machines "that infringe." *See* FID at 25 ("These designs . . . are [] outside the scope of this investigation . . . [and] are not ripe for a determination of infringement or non-infringement in this investigation.").

In applying the exclusion order to unadjudicated articles, including the 18101094 machine, Customs has denied Wirtgen the protections found in Section 1337(e): (1) the right to a preliminary determination from the Commission—the only agency authorized to make such a determination—and (2) the right to import under bond until the Commission makes a final determination. By excluding articles that the Commission has not found to infringe, Customs frustrated the entire statutory scheme.

### 2. Customs improperly applied *Auer* when it relied on Commission statements to interpret the exclusion order

Customs "jumped the gun" when it looked to the Commission's decisions in order to interpret the exclusion orders. *Kisor*, 139 S. Ct. at 2423. Customs failed to "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Id.* at 2424. As explained above, the plain language of the exclusion order and the statutory scheme permit only one meaning—only adjudicated articles are excluded. To establish its authority to adjudicate infringement in the first instance, a "statement of what it 'normally' does or has done before" is insufficient; Customs "must ground such a normal or past practice in the statutory standard." *See Mid Continent Steel & Wire, Inc. v. U.S.*, 941 F.3d 530, 537–38 (Fed. Cir. 2019). Customs' citations to Commission opinions explaining "longstanding practice" do not substitute for statutory authority.

Another inquiry that Customs failed to make is whether the Commission's interpretation of exclusion orders against articles that infringe "in some way implicate[s] its substantive expertise." *Kisor, 139 S. Ct.* at 2417. The Commission "has no comparative expertise in resolving" whether or not "machines . . . that infringe" refers to unadjudicated machines, so deference does not apply. *See id.*

Most importantly, neither Customs nor the Commission may interpret "machines . . . that infringe" to encompass machines that either agency determines to infringe after the exclusion

order issued. As the Supreme Court explained, to defer to such an interpretation "would permit the agency, under the guise of interpreting [the exclusion order], to create *de facto* a new [exclusion order]" each time it makes a new infringement determination. *See Kisor*, 139 S. Ct. at 2415. "*Auer* does not, and indeed could not, go that far." *Id.*

Even considering the Commission statements on which Customs relies, deference is "only rarely given" to an agency construction that conflicts with a prior one. *Kisor*, 139 S. Ct. at 2418. Thus, Customs improperly relied on the Commission's statement that its remedial orders extend "to all products covered by the patent claims" without considering contrary statements by the Commission.[4] Specifically, the Commission denied Wirtgen's motion to stay the exclusion order because "Wirtgen has other milling machines, not impacted by the LEO and CDO, that it can continue to sell in the United States." Comm'n Op. at 5 (Sep. 17, 2019). As support for this statement, the Commission cited and described a Federal Circuit order "denying a motion to stay, 'subject to the condition that the product redesign on which Cisco relies to deny irreparable harm must be permitted to enter the country.") *Id.*, *citing Arista Networks, Inc. v. Int'l Trade Comm'n*, Docket Nos. 2017-2289, -2351 (Fed. Cir. Sept. 22, 2017). The Commission's reliance on this Federal Circuit order plainly indicates that the Modified 1810 machines (Wirtgen's redesign), including the 18101094 machine, are not subject to the exclusion order, and the Commission relied on that fact to deny Wirtgen's motion to stay the remedial orders. There is no reason to credit the Commission's interpretive statements from other investigations and ignore statements from this investigation. *See Kisor*, 139 S. Ct. at 2418.

Finally, the Commission's interpretive statements cannot expand the scope of its exclusion orders because they do not carry the force of law. Again, as the *Kisor* court explained, "[a]n interpretive rule itself never forms the basis for an enforcement action" because it "does not impose any legally binding requirements on private parties." *Kisor*, 139 S. Ct. at 2420. "An enforcement action must instead rely on a legislative rule, which (to be valid) must go through notice and comment." *Id.* Not one of the Commission statements cited by Customs meets this standard.[5]

---

[4] *See* Ex. 2, '413 Exclusion at 2, n.1, *citing Certain Optical Disk Controller Chips and Chipsets*, Inv. No. 337-TA-506, Comm'n Op. at 56–57 (USITC Pub. 3935) (July 2007) (EDIS Doc. No. 287263).

[5] *See also*, *e.g.*, *Glycine & More, Inc. v. U.S.*, 880 F.3d 1335 (Fed. Cir. 2018) ("If Commerce wished to rewrite or amend the regulation, such a regulation intended to have the force of law must be adopted with notice-and-comment rulemaking, which was absent here."); Executive Order 13892, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, 84 Fed. Reg. 55239, 55240 (Oct. 9, 2019) ("When an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it must establish a violation of law by applying statutes or regulations.").

### 3. The exclusion order cannot reasonably require Customs to violate the law by construing claims and determining infringement

Section 337 authorizes only the Commission to construe patent claims and determine infringement. The correct interpretation of the exclusion order is that Customs may only determine if the 18101094 machine bears the same features as the machines which the Commission found to infringe—it does not.[6] Yet Customs, in its notice of exclusion, acknowledged that the Commission did not evaluate infringement of the Modified 1810 machines, yet Customs interpreted the exclusion order to allow Customs to determine that those machines nonetheless infringe claim 19. *See*, *e.g.*, Ex. 2, '413 Exclusion at 2–6. This interpretation is unreasonable because Customs lacks authority to construe claims and determine infringement.

Customs has recognized that "[it] is without legal authority to determine patent infringement."[7] And regardless of how long Customs has maintained the practice of determining infringement in the first instance, it must still identify statutory authority for doing so. *See Mid Continent Steel & Wire*, 941 F.3d at 537–38. Even if Customs had authority to interpret patent claims—which it admittedly lacks—that authority must be vested in a properly appointed Officer of the United States under the Appointments Clause. *See Arthrex, Inc. v. Smith & Nephew, Inc.*, Case No. 2018-2140, Slip Op. at 7 (Fed. Cir., Oct. 31, 2019) ("An 'Officer of the United States,' as opposed to a mere employee, is someone who 'exercis[es] significant authority pursuant to the laws of the United States.'"). It is for this reason that the Commission published a notice in the Federal Register that its administrative law judges "have been appointed in conformance with the Appointments Clause of the U.S Constitution and with the Tariff Act." 83 Fed. Reg. 45678 (Sep. 10, 2018). Customs, however, did not and cannot appoint such officers.

Accordingly, Customs may only exclude articles that the Commission has adjudicated to infringe. Because the Commission did not adjudicate the Modified 1810 machines, including the 18101094 machine, no reasonable interpretation of the exclusion order could require Customs to do so.

### C. Customs may not place the burden of proof on Wirtgen

The Court of International Trade held that Customs has the burden of proof if a product was not part of the underlying investigation. In such situations, "[t]o support the exclusion . . . Customs ha[s] to make a substantive determination that the [e]xcluded [products] infringe."

---

[6] As explained above, the swing leg of the Modified 1810 machines, including the 18101094 machine, does not have the features found to infringe, but instead bears the features of the SF 102 C, a machine that the Commission found to be outside the scope of claim 19.

[7] *See* Working with U.S. Customs and Border Protection and Customs in the European Union to Protect Your Intellectual Property Rights, *available at* https://web.archive.org/web/20111015013138/https://www.stopfakes.gov/pdf/US_EU_Customs_Guidelines_Pamphlet.pdf (captured Oct. 15, 2011).

*Corning Gilbert Inc. v. U.S.*, 896 F. Supp. 2d 1281, 1290 (CIT 2013). Customs recognized that the Commission did not evaluate infringement of the Modified 1810 machines. *See* Ex. 2, '413 Exclusion at 3, 5. Customs, therefore, improperly placed the burden on Wirtgen "*as a condition of entry* . . . to show that the potentially infringing articles (i.e., [] Wirtgen's Series 1810 milling machines) do not infringe claim 19 of the '693 patent . . . before CBP." Ex. 2, '413 Exclusion at 3 (emphasis in original).

The Federal Circuit does not allow placing the burden of proof on the alleged infringer through an "overly broad [] permanent injunction that simply prohibits future infringement of a patent." *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004). Section 337 provides no authority for depriving Wirtgen of this standard due-process protection. Rather, it does the opposite by specifically incorporating the protections from district court. It permits anyone previously found in violation to petition "for a modification or rescission" of a remedial order "on grounds which would permit relief from a judgment or order under the Federal Rules of Civil Procedure." 19 U.S.C. § 1337(k)(2). It also provides respondents in 337 investigations the same due process rights, burdens of proof, and legal and equitable defenses enjoyed by defendants in federal courts. 5 U.S.C. §§ 556(d), 706(2)(B); 19 U.S.C. § 1337(c). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Interpreting the exclusion order to cover an unknown number of unidentified, unadjudicated products would not provide notice of what is covered, therefore such an interpretation would be unreasonable.

Customs improperly relied on out-of-context dictum from *Hyundai Elecs. Indus. Co. v. Int'l Trade Comm'n*, 899 F.2d 1204 (Fed. Cir. 1990). Hyundai appealed the Commission's decision to impose a certification provision included in a limited exclusion order. The Federal Circuit found that the Commission did not abuse its discretion "by concluding that Hyundai rather than Intel should bear whatever additional burden the certification provision entails. *See, e.g.*, *SSIH Equip.*, 718 F.2d at 370." *Id.* at 1210. The court applied the rationale of a general exclusion order "that binds parties and non-parties alike and effectively shifts to would-be importers . . . the burden of establishing non-infringement." *Id.* In addition to being dictum[8]— Hyundai was challenging the certification provision, not burden-shifting—this statement refers to a general exclusion order imposing an exclusion against a *party* that was not part of the underlying investigation. It says nothing about excluding a *product* that was not part of the underlying investigation.

---

[8] The cited authority does not provide any support for *Hyundai*'s dictum. In *SSIH* the Federal Circuit held that Section 337(h) permits the Commission to modify a remedial order during the presidential review period. *SSIH Equip. S.A. v. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983). Simply put, as to whether Customs may place the burden of proving non-infringement on Wirtgen, *SSIH* says nothing at all.

Customs' reliance on dictum from *Sealed Air* is no more persuasive.[9] *Sealed Air* deals with adjudicated products of a defaulting respondent, a practice specifically authorized by section 337(g)(1). In *Sealed Air* the Federal Circuit found that the Commission "was fully justified" in finding Unipak in default and excluding its products because the complainant established "prima facie, that the process employed by Unipak infringes." *Sealed* Air, 645 F.2d at 988. Because Unipak's "present process is in effect presumed to [infringe]," it was proper to exclude the products of that process until Unipak could petition for a proceeding "to determine whether entry should be allowed." *Id.* at 988–989, n. 20. *Sealed Air* does not uphold shifting the burden of proof to a respondent seeking to import unadjudicated products.

Customs bore the burden of proof to establish that the 18101094 machine was within the scope of the exclusion order. Having failed to do so in its notice of exclusion, Customs cannot make the attempt during the protest phase. *See Corning Gilbert Inc. v. U.S.*, 896 F. Supp. 2d 1281, 1291 (CIT 2013) ("The 30 days allowed by the regulation to act on a protested decision provide time for the agency to explain the analysis and reasoning underlying the protested decision, not to engage in thinking about this decision for the first time.") Customs must release the Modified 1810 machine.

## VII.    CONCLUSION

As set forth above, the Commission has already determined that a rotationally decoupled swing leg does not infringe claim 19 of the '693 patent. The evidence shows that the swing leg of the Modified 1810 machines are also rotationally decoupled, therefore Customs is bound to find that the Modified 1810 machines are not covered by the exclusion order and allow the Modified 1810 machines, including the 18101094 machine, entry into the United States.

Moreover, Wirtgen has certified that the 18101094 machine is outside the scope of paragraph 1 of the exclusion order. Customs may not place substantive restrictions on Wirtgen's use of the certification provision. Customs must accept Wirtgen's certification and allow the 18101094 machine entry into the United States. Customs may not rely on any Commission interpretations of exclusion orders in other investigations because the certification provision of the exclusion order is clear and deference to any Commission interpretation is inappropriate under *Auer*.

Customs may not interpret the exclusion order to include the 18101094 machine or any other Modified 1810 machine because (1) the plain language of Paragraph 1 of the exclusion order is limited to the articles that the Commission found to infringe, (2) Customs may not

---

[9] *See* Ex. 2, '413 Exclusion at 3, *citing Certain Integrated Circuit Telecommunication Chips*, Inv. No. 337-TA-337, Comm'n Op. at 21, n.14 (USITC Pub. 2670) (Aug. 1993) ("The Federal Circuit has upheld a Commission remedy which effectively shifted the burden of proof on infringement issues to require a company seeking to import goods to prove that its product does not infringe.") (*citing Sealed Air Corp. v. Int'l Trade Comm'n*, 645 F.2d 976, 988–89 (C.C.P.A. 1981)).

reinterpret the exclusion order to effectively issue a new exclusion order, and (3) Customs does not have statutory or constitutional authority to construe patents, so the exclusion order cannot be interpreted in a way that requires Customs to assume such authority. Customs may only determine whether the 18101094 machine bears a design that the Commission found to be covered by—or not covered by—claim 19. Having failed to do so, Customs must allow entry of the 18101094 machine.

Finally, Customs may not place the burden of proof on Wirtgen, nor may it rely on failure of proof as a basis to exclude Wirtgen's machines. Rather, at the time of exclusion Customs bears the burden of proving that the 18101094 machine is subject to the exclusion order. Having failed to meet that burden, Customs must allow entry of the 18101094 machine.

The notice of exclusion does not provide a legal basis for Customs to deny entry to the 18101094 machine. Customs may not devise a new legal basis during the protest phase. Accordingly, Wirtgen respectfully requests that Customs grant Wirtgen's protest and allow the 18101094 machine entry into the United States.

Sincerely,

COUNSEL FOR WIRTGEN GMBH, WIRTGEN GROUP HOLDING GMBH, AND WIRTGEN AMERICA, INC.

Daniel E. Yonan
Ralph W. Powers III
Dallin G. Glenn
STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC 20005
(202) 371-2600

Ryan D. Levy
Seth R. Ogden
PATTERSON INTELLECTUAL PROPERTY LAW, P.C.
Roundabout Plaza
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400

# TABLE OF EXHIBITS

| **Exhibit 1** | Declaration of Jan Schmidt |
| **Exhibit 2** | Exclusion Decision for Entry Number SCS-77482413 |
| **Exhibit 3** | Limited Exclusion Order issued in Commission Inv. No. 337-TA-1088 on June 27, 2019 |
| **Exhibit 4** | Wirtgen Certification |
| **Exhibit 5** | Memorandum sent on September 5, 2019, to Customs Intellectual Property Rights Branch |

Exhibit 1

**UNITED STATES CUSTOMS AND BORDER PROTECTION**

| | |
|---|---|
| **In Support of Protest of** | **Relating to Exclusion Order Issued in** |
| **Wirtgen America, Inc.** | **Investigation No. 337-TA-1088** |

**DECLARATION OF JAN HENDRIK SCHMIDT**

I, Jan Hendrick Schmidt, on behalf of Wirtgen America, Inc. ("Wirtgen"), declare under penalty of perjury as follows:

1. I am over the age of eighteen and otherwise competent to testify.

2. I make this Declaration in support of Wirtgen's protest against the decision of U.S. Customs and Border Protection to exclude certain Wirtgen road milling machines.

3. I have worked at Wirtgen for more than thirty-three years. I am currently the Vice President of Product Support at Wirtgen and have been in that position for about twelve years.

4. As Vice President of Product Support, I am responsible for Customer (After Sales) Support for the four Wirtgen Group brands (Wirtgen, Vögele, Hamm, and Kleemann) sold by Wirtgen. For example, I am responsible for technical service support (remote and in the field), parts planning and purchasing, inventory management, service and parts training for customer, dealer and internal personnel, warranty, inbound and outbound logistics for all whole (i.e., machines) and parts, machine registrations, etc.

5. Wirtgen-brand products include cold milling machines, soil stabilizers, cold recyclers, binding agent spreaders, slipform pavers, and surface miners.

6. With respect to Wirtgen's cold milling machines, there are three size classifications: (1) large milling machines, (2) compact milling machines, and (3) small milling machines.

7. The milling machines at issue in this Investigation are compact milling machines. Compact milling machines are kind of a hybrid between small and large milling machines that provide more flexibility. Compact milling machines are designed to mill a width of from about three and a quarter feet to about five feet and achieve cutting depths up to about thirteen inches. The engines used in compact milling machines also provide more power than small milling

machines, even when equipped with drums of the same size. In the United States, these would include the current generation Wirtgen models W 100 CFi, W 120 CFi, and W 130 CFi, which Wirtgen calls the 1810 Series. This generation replaced the prior generation models W 100 Fi, W 120 Fi, and W 130 Fi, which Wirtgen calls the 1310 Series.

8. Wirtgen's compact milling machines utilize a swing leg to permit greater flexibility in milling operations. A swing leg is a term for a lifting column that pivots the wheel or track between various positions. An operator can selectively position the right rear leg of the machine outside the milling drum to improve the weight distribution of the machine and improve stability. The operator can also position the right rear leg of the machine inside the milling drum to mill closer to an adjacent obstacle.

9. Wirtgen offers a full line of road milling machines with differing designs, features, and specifications to meet customer demand. Customers specify the cutting width and location of the cutter assembly for the types of jobs they expect to encounter. Indeed, we regularly have customers purchase machines with particular specifications solely to obtain the best performing machine for a specific road construction project for which they have placed a bid or obtained a contract. For example, cutting width and the location of the cutter assembly (e.g., at the rear of the machine in Wirtgen's 1810 Series machines) is important to milling contractors when cutting parking lots, bridge approaches, and performing utility work. Other factors that influence customers to specifically purchase Wirtgen's 1810 Series machines include ease of hauling, efficiency in cutting bridge decks due to the rear-mounted cutter, the compactness of the machine that provides for milling tight areas and widening roads as part of infrastructure upgrades, and performing patch cutting operations when the whole road does not need repair.

10.     Customers do not consider other milling machines offered by Wirtgen—whether larger or smaller options—to be replacements or substitutes for the Wirtgen 1810 Series machines, as they do not fulfill the same operational needs as the Wirtgen 1810 Series. In addition, Wirtgen provides extensive training to customers specific to the operation of each different machine that Wirtgen sells. If Wirtgen's customers are unable to purchase a Wirtgen 1810 Series machine, they must spend time to be trained to operate another Wirtgen machine that will not fully satisfy their needs, or a competitor machine for which they will have less familiarity than with Wirtgen machines.

11.     Wirtgen's larger milling machine options, ranging from the W 150 CFi (0813 Series) to the W 250i (0622 Series) have a cutter drum located toward the center of the machine between the front and rear legs that lacks the advantages of the rear-mounted cutter drum found in the Wirtgen 1810 Series machines (e.g., efficiency in cutting bridge decks). Furthermore, none of the larger milling machine options—including the W 150 CFi that Caterpillar has argued is a substitute for the Wirtgen 1810 Series machines—include a swing leg. Larger milling machines also require more space for the machine and must cut a wider track than the 1810 Series machines. Thus, Customers that require the flexibility of the 1810 Series will not consider large milling machines to be a feasible substitute.

12.     Wirtgen's smaller milling machine options, ranging from the W 35 Ri (0703 Series) to the W 130 H (2010 Series) rely on engines that lack the power of the engines of the Wirtgen 1810 Series machines. Thus, even the smaller machines that permit cutter drums having the same widths as the Wirtgen 1810 Series machines cannot cut to the same depth or with the same speed as the Wirtgen 1810 Series machines. Furthermore, all of Wirtgen's smaller milling machine options are rear loaders, whereas the Wirtgen 1810 Series machines are front loaders.

This distinction relates to the position of the conveyor belt that carries milled material to be deposited in dump trucks and carried off from the jobsite during operation. Depending on their size, milling machines can load as much as thirty-eight (38) tons of millings in about 4 (four) minutes. Thus, a milling machine might be required to load milled material into anywhere from ten (10) to fifteen (15) trucks per hour. Front-loading milling machines provide significantly higher discharge capacity. Customers who need increased milling capacity or whose operators are accustomed to operating a front-loading milling machine would not consider a rear-loading milling machine to be a feasible substitute.

13.     In summary, many of our customers purchase the Wirtgen 1810 Series machines for use in jobs that require compact size and maneuverability paired with a high milling rate and discharge capacity. For these jobs, the Wirtgen 1810 Series is ideal and no other Wirtgen machine is a feasible substitute.

14.     I understand that, as part of the above-captioned Investigation, Caterpillar argued that Wirtgen's 1810 Series machines infringed a Caterpillar patent related to the swing leg. I further understand that, as a result of that Investigation, the International Trade Commission ("Commission") found a violation based on a single claim of Caterpillar's patent. Thus, the Commission issued remedial orders instructing United States Customs and Border Protection ("Customs") to exclude the 1810 Series machines that were found to infringe from importation into the United States.

15.     Wirtgen has subsequently redesigned the swing leg of its 1810 Series machines. The redesigned machines, though still bearing serial numbers designating them as 1810 Series machines, have new branding as the W 100 XFi, W 100 XTi, W 120 XFi, W 120 XTi, W 130 XFi, and W 130 XTi (the "Modified 1810 Series machines"). The "X" indicates that the

machines have the new swing-leg design, which is identical for all of the Modified 1810 Series machines. The "F" and the "T" indicate differences among the machines regarding features wholly unrelated to the swing leg, chiefly related to cost with the XTi machines being a more value-based option than the XFi machines.

16.    The swing leg of the 18101069 machine is representative of all Modified 1810 Series machines. Below are photographs showing the swing leg of the 18101069 machine. The annotations to these drawings are accurate.







17.     The following diagram is an accurately annotated drawing of the lifting column of the Modified 1810 Series machines. The drawing shows that the axis around which the track rotates is not coaxial with the axis of the lifting column.

# Column and track rotate on different axes

### Cross-section of the lifting column and steering yoke



18.     The following diagram is an accurately annotated drawing of the lifting column of the unmodified swing leg design of the 1810 Series machines. The drawing shows that, in that design, the lifting column was rotationally coupled to the track.



19.     The following diagrams are accurately annotated drawings of the lifting column of the swing leg of the Modified 1810 Series machine. The drawings show that the lifting column and the track are rotationally decoupled.



pivoting actuator

yoke

track

lifting column

steering actuator

fixed plate of lifting column

direction of travel



pivoting actuator

lifting column

fixed plate of lifting column

steering actuator

yoke

track

direction of travel

20. Below is an accurately annotated photograph of a side view of the swing leg of the 18101069 machine with the track unrotated (in other words, steering straight ahead).



21. Below is an accurately annotated photograph of an elevated view of the swing leg of the 18101069 machine with the track unrotated (in other words, steering straight ahead).



22.     Below is an accurately annotated photograph of a side view of the swing leg of

the 18101069 machine with the track rotated left (in other words, steering to the left).



23.     Below is an accurately annotated photograph of an elevated view of the swing leg

of the 18101069 machine with the track rotated left (in other words, steering to the left).



24.    Below is an accurately annotated photograph of a side view of the swing leg of the 18101069 machine with the track rotated right (in other words, steering to the right).



25.    Below is an accurately annotated photograph of an elevated view of the swing leg of the 18101069 machine with the track rotated right (in other words, steering to the right).



Executed on December 24, 2019.

_____
Jan Hendrik Schmidt

Exhibit 2

December 27, 2019

WIRTGEN AMERICA INC.
6030 DANA WAY
ANTIOCH, TN 37013-3116

Sir/Madam:

Pursuant to 19 U.S.C. § 1337(d) the following shipment is excluded from entry for consumption into the United States, entry for consumption from a foreign-trade zone (FTZ), and/or withdrawal from a warehouse for consumption by reason of the limited exclusion order issued by the U.S. International Trade Commission ("Commission") in Investigation No. 337-TA-1088 ("the 1088 investigation").

> Articles Denied Entry: Wirtgen Cold Milling Machine, model W 120 XFi, Serial No. 18101094
> Quantity: 1
> Vessel/Airline: TYSLA CF933/WALLENIUS WILHELMSEN LOGISTICS AMERICAS
> Bill of Lading: WLWH-DE2013112
> Date of Denial of Entry: December 27, 2019

You have thirty days from the date of this letter to export the subject merchandise from the United States, admit the subject merchandise into an FTZ, or enter the subject merchandise into a bonded warehouse. If, within thirty days, the merchandise is not admitted to an FTZ, entered into a bonded warehouse or exported, it will be disposed of under the supervision of U.S. Customs and Border Protection ("CBP"). The requirement to act within thirty days is not tolled by seeking any of the relief discussed below.

If you believe this exclusion is made in error because either CBP or the Commission previously determined that the above-identified articles are not subject to the above-noted exclusion order, or because the above-identified articles are subject to an exception set forth in the exclusion order, please contact the Intellectual Property Rights Branch (the "IPR Branch"), Office of Trade, Regulations and Rulings electronically at the following e-mail addresses:

> To: Charles.R.Steuart@cbp.dhs.gov
> Cc: IPRBranch.ITC337.Admin@cbp.dhs.gov

The correspondence should include an electronic version of this Notice (*i.e.*, PDF the hardcopy and then attach to an email). The PDF should be transmitted in a password-protected manner with the actual password sent using a separate email. The correspondence should clearly identify the portions of the Commission record or a formal CBP ruling where it was determined that the above-identified articles are not subject to the above-noted exclusion order. Please note that prior instances of release of articles following entry, even in instances where an examination or detention has occurred prior to that release, is not a formal CBP ruling as to the admissibility of the articles in question.

The above-identified exclusion order is not limited to the specific products that were before the Commission during the investigation, but instead extends to all products, including any new or redesigned products, that are manufactured abroad by or on behalf of, or are imported by or on behalf of, the Respondents or any of their affiliated companies, parents, subsidiaries, agents, or other related business entities, or their successors or assigns, that infringe the relevant intellectual property.[1] If you believe the above-identified article is not subject to the above-identified exclusion order, a petition for modification of the exclusion order may be filed with the Commission.

The Commission has authority to modify or rescind a remedial order pursuant to 19 U.S.C. § 1337(k) if it "finds, and in the case of exclusion from entry notifies the Secretary of the Treasury, that the conditions which led to such exclusion from entry or order no longer exist." In accordance with that statutory provision, the Commission has promulgated rules governing modification proceedings. *See* 19 C.F.R. § 210.76(a)(1). In addition, on February 23, 2015, the Commission announced a Pilot Program to test an expedited administrative process in these proceedings.[2] Commission modification decisions are final determinations appealable to the U.S. Court of Appeals for the Federal Circuit. *See, e.g., Allied Corp. v. U.S. Int'l Trade Comm'n*, 850 F.2d 1573 (Fed. Cir. 1988).

For your future reference, please also note that one may obtain prospective guidance, prior to importation, regarding whether an article is subject to an exclusion order by seeking: (i) an advisory opinion from the Commission and/or (ii) requesting a Part 177 ruling from CBP. *See* 19 C.F.R. § 210.79; 19 C.F.R. Part 177.

---

[1] *See Certain Optical Disk Controller Chips and Chipsets*, Inv. No. 337-TA-506, Comm'n Op. at 56–57 (USITC Pub. 3935) (July 2007) (EDIS Doc. No. 287263) ("The Commission's long-standing practice is to direct its remedial orders to all products covered by the patent claims as to which a violation has been found, rather than limiting its orders only to those specific models selected for the infringement analysis . . . [W]hile individual models may be evaluated to determine importation and infringement, the Commission's jurisdiction extends to all models of infringing products that are imported at the time of the Commission's determination and to all such products that will be imported during the life of the remedial orders.").

[2] Available at:
https://www.usitc.gov/press_room/featured_news/pilot_program_will_test_expedited_procedures_usitc.htm (last visited Nov. 27, 2019).

**Additional Information**

Paragraph 1 of the limited exclusion order issued in the 1088 investigation states:

> Road construction machines and components thereof that infringe claim 19 of the '693 patent[3] that are manufactured abroad by or on behalf of, or are imported by or on behalf of, the Respondents[4] or any of their affiliated companies, parents, subsidiaries, agents, or other related business entities, or their successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption, for the remaining term of the '693 patent, except under license of the patent owner or as provided by law, and except for service or repair components imported for use in servicing or repairing road construction machines that were imported prior to the effective date of this Order.

*See* LEO (EDIS Doc. No. 679595).

In the 1088 investigation, the Commission found "a section 337 violation based on the infringement of claim 19 of the '693 patent by Wirtgen's series 1810 milling machines." *Certain Road Construction Machines and Components Thereof,* Investigation No. 337-TA-1088, Comm'n Op. at 46 (July 15, 2019) (Public Version) (EDIS Doc. No. 681394) ("Comm'n Op.").

The issuance of an exclusion order "effectively shifts to would-be importers of potentially infringing articles, as a condition of entry, the burden of establishing noninfringement." *Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n,* 899 F.2d 1204, 1210 (Fed. Cir. 1990); *Certain Integrated Circuit Telecommunication Chips,* Inv. No. 337-TA-337, Comm'n Op. at 21, n.14 (USITC Pub. 2670) (Aug. 1993) (EDIS Doc. No. 217024), (emphasis in original) (citing *Sealed Air Corp. v. U.S. Int'l Trade Comm'n,* 645 F.2d 976, 988–89 (C.C.P.A. 1981)) ("The Federal Circuit has upheld a Commission remedy which effectively shifted the burden of proof on infringement issues to require a company seeking to import goods to prove that its product does *not* infringe. . . .").

Accordingly, *as a condition of entry*, the burden is on Wirtgen to show that the potentially infringing articles (*i.e.*, the Wirtgen's series 1810 milling machines) do not infringe claim 19 of the '693 patent. Thus far, Wirtgen has not met this burden either in the underlying investigation or before CBP:

1. In the 1088 investigation, while Wirtgen presented "alternate swing-leg designs," the Administrative Law Judge ("ALJ") found "'[t]hese alternate swing-leg designs' are not ripe for a determination of infringement or non-infringement in this investigation." Final Initial Determination at 24-25 (Feb. 14, 2019) (Public Version) (EDIS Doc. No. 670148)

---

[3] U.S. Patent No. 7,140,693 ("the '693 patent"). *See* LEO (EDIS Doc. No. 679595).

[4] Wirtgen GmbH, Wirtgen Group Holding GmbH, and Wirtgen America, Inc. (collectively "Respondents"). *See* LEO (EDIS Doc. No. 679595).

("FID"). Wirtgen did not petition for review of the FID's findings on this issue, and the Commission determined not to review this issue. Comm'n Op. at 10 n.22.

2. On August 13, 2019, and again, on August 15, 2019, the IPR Branch offered Wirtgen an opportunity to submit a request for an administrative ruling under 19 C.F.R. part 177 to obtain guidance as to whether its redesign falls within the scope of the limited exclusion order issued in the 1088 investigation. The IPR Branch further noted that there were also administrative procedures available at the Commission.

3. In the Commission's Order issued September 12, 2019 denying Wirtgen's motion for a stay of the Commission's remedial orders pending appeal, the Commission noted the procedures available to Wirtgen at the Commission to "obtain a timely ruling regarding whether its redesign falls within the scope of the remedial order." Commission Order at 6, n.8 (Sept. 12, 2019) (Public Version) (EDIS Doc. No. 688119) ("Wirtgen states that it 'is attempting to bring to market a redesign that would not be subject to the Commission's exclusion order.' Wirtgen's Mot. at 19 n.1. The Commission notes that there are procedures available under Commission Rules 210.76 and 210.79 through which Wirtgen may obtain a timely ruling regarding whether its redesign falls within the scope of the remedial order. *See* 19 C.F.R. §§ 210.76, 210.79.").

To date, Wirtgen has neither used the procedures available under Commission Rules 210.76 and 210.79 to obtain a determination from the Commission regarding whether its redesign falls within the scope of the limited exclusion order issued in the 1088 investigation. Nor has Wirtgen requested guidance from CBP under 19 C.F.R. part 177 on that issue.

Instead, Wirtgen opted to submit a memorandum[5] to the IPR Branch on September 5, 2019, stating that they "will be importing a road milling machine that has been modified to be outside the scope of the limited exclusion order . . . issued by the U.S. International Trade Commission . . . in Investigation No. 337-TA-1088." In the email accompanying this memorandum, Wirtgen noted that the "first modified milling machine" was scheduled to arrive on September 9, 2019 (*i.e.*, 4 days after submission of the memorandum). In addition to the memorandum, Wirtgen provided photographs and videos of an XFi[6] machine with a particular serial number, and noted that a technician could be arranged to demonstrate the operation of this machine at the port if needed. In a later email that same day, Wirtgen further stated that this memorandum was not a request for an administrative ruling under 19 C.F.R. part 177, but rather only a "courtesy" to let CBP know that an XFi machine "is already on the way." Wirtgen further noted that "[s]hould Customs determine to exclude that machine [described in the memorandum], Wirtgen intends to file an administrative protest under 19 C.F.R. [part] 174."

Since the submission of the memorandum to the IPR Branch on September 5, 2019, Wirtgen did not provide any additional information to the IPR Branch regarding its purportedly modified machines until December 2, 2019 following detention of one of its shipments. On December 2,

---

[5] Nothing in the email or memorandum was designated as confidential.

[6] In the memorandum, Wirtgen noted that "[a]ll future modified machines can be identified by the 'XFi', e.g., W 100 XFi, W120 XFi, and W130 XFi."

2019, Wirtgen's broker submitted what appeared to be a self-certification from Wirtgen signed and dated September 9, 2019. This self-certification stated that the articles being imported are not subject to the exclusion order issued in the 1088 investigation.

With respect to Wirtgen's self-certification signed and dated September 9, 2019; and to the extent Wirtgen's memorandum dated September 5, 2019 is a form of self-certification, we note the following: CBP will not accept a certification that an article falls outside the scope of an exclusion order absent a determination by CBP or the Commission that the article is not subject to the exclusion order. *See e.g.*, *Certain Road Milling Machines and Components Thereof*, Inv. No. 337-TA-1067, Comm'n Op. at 15 n.5 (Aug. 7, 2019) (Public Version) (EDIS PTAB) No. 684600), *citing Certain Network Devices, Related Software & Components Thereof (I)*, Inv. No. 337-TA-944, Comm'n Op. at 53 n.19 (Jun. 23, 2016) ("The standard [certification] provision does not allow an importer to simply certify that it is not violating the exclusion order. Rather, CBP only accepts a certification that the goods have been previously determined by CBP or the Commission not to violate the exclusion order.").

In addition, we note that on December 13, 2019, counsel for Wirtgen sent the IPR Branch a copy of a final written decision from the Patent Trial and Appeal Board ("PTAB") of the U.S. Patent and Trademark Office ("USPTO") finding certain claims, including claim 19, of the '693 patent unpatentable. *Wirtgen America, Inc. and Joseph Vogele AG v. Caterpillar Paving Products Inc.*, IPR2018-01201, Final Written Decision (Dec. 13, 2019) at 35. However, the Commission has previously stated "that patent claims are valid until the [USPTO] issues certificates [for] cancelling [ ] those claims, which it cannot do until the exhaustion of any appeals [the patent owner] may take from the PTAB's final written decisions." *See e.g.*, *Certain Network Devices, Related Software and Components Thereof (II)*, Inv. No. 337-TA-945, Comm'n Op. at 12 (Aug. 16, 2017) (Public Version) (EDIS Doc. No. 620120) (". . . the Commission finds that the PTAB final written decisions finding the relevant claims of the '577 and '668 patents unpatentable do not constitute a changed circumstance warranting temporarily rescinding the remedial orders issued in Inv. No. 337-TA-945, *Certain Network Devices (II)*."). To date, the USPTO has not issued certificates cancelling claim 19 of the '693 patent and the Commission has not modified or set aside the limited exclusion order issued in the 1088 investigation. Hence, the limited exclusion order issued in the 1088 investigation remains in effect.

Wirtgen has not met its burden to show that the above-identified articles are not within the scope of the limited exclusion order. In the 1088 investigation, the Commission found "a section 337 violation based on the infringement of claim 19 of the '693 patent by Wirtgen's series 1810 milling machines." Comm'n Op. at 46. Further, in the 1088 investigation, while Wirtgen presented "alternate swing-leg designs," the ALJ found "'[t]hese alternate swing-leg designs' are not ripe for a determination of infringement or non-infringement in this investigation." FID at 24-25. Wirtgen did not petition for review of the FID's findings on this issue, and the Commission determined not to review this issue. Comm'n Op. at 10 n.22. In addition, there have been no subsequent proceedings at the Commission in which Wirtgen's series 1810 milling machines have been found not to infringe claim 19 of the '693 patent.

The above-identified articles denied entry are Wirtgen's series 1810 cold milling machines. Wirtgen's memorandum dated September 5, 2019 claims that "a road milling machine . . . has

been modified to be outside the scope of the limited exclusion order . . . issued by the U.S. International Trade Commission . . . in Investigation No. 337-TA-1088. . . ." However, the serial number of the machine described in the memorandum is different than the serial number of the above-identified articles. Accordingly, pursuant to 19 U.S.C. § 1337(d), the above-identified articles are excluded from entry for consumption into the United States, entry for consumption from a FTZ, and/or withdrawal from a warehouse for consumption by reason of the limited exclusion order issued by the Commission in the 1088 investigation.

A copy of this notice is being furnished to the U.S. International Trade Commission. You are hereby notified that any future attempt to import such articles may result in the articles being seized and forfeited.


Sincerely,


Juan J. Porras
Director of Machinery Center of Excellence & Expertise
U.S. Customs and Border Protection
Laredo, Texas


cc:     U.S. International Trade Commission
        U.S. Customs and Border Protection, Intellectual Property Rights Branch, Regulations & Rulings, Office of Trade

Exhibit 3

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

|  |  |
|---|---|
| In the Matter of<br><br>**CERTAIN ROAD CONSTRUCTION**<br>**MACHINES AND COMPONENTS**<br>**THEREOF** | **Investigation No. 337-TA-1088** |

## LIMITED EXCLUSION ORDER

The United States International Trade Commission ("Commission") has determined that there is a violation of Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), in the unlawful importation, sale for importation, or sale within the United States after importation by respondents Wirtgen GmbH, Wirtgen Group Holding GmbH, and Wirtgen America, Inc. (collectively "Respondents") of certain road construction machines and components thereof covered by claim 19 of U.S. Patent No. 7,140,693 ("the '693 patent").

Having reviewed the record of this investigation, including the written submissions of the parties, the Commission has made its determination on the issues of remedy, public interest, and bonding. The Commission has determined that the appropriate form of relief includes a limited exclusion order prohibiting the unlicensed entry into the United States of certain road construction machines and components thereof manufactured by or on behalf of, or are imported by or on behalf of, the Respondents or any of their affiliated companies, parents, subsidiaries, licensees, or other related business entities, or their successors or assigns that infringe claim 19 of the '693 patent.

The Commission has also determined that the public interest factors enumerated in 19 U.S.C. § 1337(d) do not preclude the issuance of the limited exclusion order, and that the bond

during the period of Presidential review shall be in the amount of zero (0) percent of the entered value of the infringing products.

Accordingly, the Commission hereby ORDERS that:

1.     Road construction machines and components thereof that infringe claim 19 of the '693 patent that are manufactured abroad by or on behalf of, or are imported by or on behalf of, the Respondents or any of their affiliated companies, parents, subsidiaries, agents, or other related business entities, or their successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption, for the remaining term of the '693 patent, except under license of the patent owner or as provided by law, and except for service or repair components imported for use in servicing or repairing road construction machines that were imported prior to the effective date of this Order.

2.     This Order does not apply to Respondents' series 1310 road-milling machines, which, as the Commission determined, do not infringe claim 19 of the '693 patent.

3.     Notwithstanding paragraph 1 of this Order, the aforesaid road construction machines and components thereof are entitled to entry into the United States for consumption, entry for consumption from a foreign trade zone, or withdrawal from a warehouse for consumption, under bond in the amount of zero (0) percent of the entered value of the infringing products pursuant to subsection (j) of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337(j)), and the Presidential Memorandum for the United States Trade Representative of July 21, 2005, (70 FR 43251), from the day after this Order is received by the United States Trade Representative, and until such time as the United States Trade representative notifies the

Commission that this Order is approved or disapproved but, in any event, not later than sixty (60) days after the date of receipt of this Order.

4.      At the discretion of U.S. Customs and Border Protection ("CBP") and pursuant to the procedures it establishes, persons seeking to import road construction machines and components thereof, that are potentially subject to this Order may be required to certify that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order. At its discretion, CBP may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate this certification.

5.      In accordance with 19 U.S.C. § 1337(l), the provisions of this Order shall not apply to road construction machines and components thereof that are imported by or for the use of the United States, or imported for and to be used for, the United States with the authorization or consent of the Government.

6.      The Commission may modify this Order in accordance with the procedures described in Rule 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

7.      The Secretary shall serve copies of this Order upon each party of record in this Investigation and upon CBP.

8.      Notice of this Order shall be published in the Federal Register.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:   June 27, 2019

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **Order, Commission** has been served to
the following parties as indicated, on **June 27, 2019**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainants Caterpillar Inc. and Caterpillar
Paving Products, Inc.:**

Luke McCammon, Esq.
**FINNEGAN, HENDERSON, FARABOW, GARRETT,
GARRETT & DUNNER, LLP**
901 New York Avenue NW
Washington, DC 20001

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

**On Behalf of Respondents Wirtgen Gmbh, Joseph Vogele AG,
Wirtgen Group Holding GmbH, and Wirtgen America, Inc. :**

Daniel E. Yonan
**STERNE, KESSLER, GOLDSTEIN & FOX PLLC**
1100 New York Avenue
Washington, DC 20005

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

Exhibit 4

We, Dr. Günter Hähn and Dr. Cyrus Barimani, on behalf of Wirtgen GmbH, hereby certify that

1.  We are familiar with the terms of the limited exclusion order issued by the United States International Trade Commission in the investigation entitled *Certain Road Construction Machines and Components Thereof,* Investigation No. 337-TA-1088;

2.  We have made appropriate inquiry; and

3.  Thereupon state that, to the best of our knowledge and belief, the articles being imported are not excluded from entry under paragraph 1 of the Order because:

    a.  The articles being imported are not road construction machines or components thereof that infringe claim 19 of U.S. Patent No. 7,140,693; or

    b.  The articles being imported are components, not including complete road construction machines, imported for use in servicing or repairing road construction machines that were imported prior to the effective date of the Order.

At CBP'S discretion and upon demand, we agree to furnish to CBP such records or analyses as are necessary to substantiate this certification.

We declare under penalty of perjury that the foregoing certification is true and correct.

**W WIRTGEN**

WIRTGEN GmbH
Reinhard-Wirtgen-Str. 2
53578 Windhagen · Germany

Windhagen, 09.09.2019

Dr. Günter Hähn
Managing Director

ppa. Dr. Cyrus Barimani
Head of R&D,
Authorized Representative

Exhibit 5



September 5, 2019

Christopher A. Bullard, Attorney-Advisor
**IPR Branch**
Regulation and Rulings
Office of Trade
U.S. Customs and Border Protection
90 K Street, N.E., 10th Floor
Washington, D.C. 20229-1177
Email: Christopher.A.Bullard@cbp.dhs.gov

RE:    **U.S. International Trade Commission; Limited Exclusion Order; Investigation No.
       337-TA-1088,** *Certain Road Construction Machines and Components Thereof*

Dear Mr. Bullard:

      Respondents in the above-captioned Investigation, Wirtgen GmbH, Wirtgen Group
Holding GmbH, and Wirtgen America, Inc. (collectively, "Wirtgen") write to inform you that we
will be importing a road milling machine that has been modified to be outside the scope of the
limited exclusion order ("LEO") issued by the U.S. International Trade Commission ("ITC" or
"Commission") in Investigation No. 337-TA-1088 ("the 1088 Investigation"). To facilitate your
review, we note that the to-be-imported machine has been branded with the model name W120
XFi (the XFi machine).[1]

      During its investigation, the Commission found that a certain road milling machine fell
outside the claim scope because its swing leg's lifting column and yoke were rotationally
decoupled. That finding is binding on Customs. Accordingly, we write to provide evidence
regarding the operation of the swing leg of the XFi machine. We trust that your review of the
evidence and, if desired, an inspection of the machine at the port, will confirm that this machine
has a swing leg whose lifting column and yoke are rotationally decoupled and, therefore, are
outside the scope of the LEO based on the Commission's determination.

## I.    BACKGROUND

      Complainants Caterpillar Inc. and Caterpillar Paving Products, Inc. brought the 1088
Investigation asserting, *inter alia*, U.S. Patent Nos. 7,140,693 (the '693 patent). The ALJ
conducted an evidentiary hearing on Sept. 25 and 26, 2018, and issued a Final Initial

---

[1] All future modified machines can be identified by the "XFi", e.g., W 100 XFi, W120 XFi, and W130
XFi. The machines vary in milling drum width. The structure and operation of the swing leg is identical
for each XFi machine.

Determination (FID) finding a violation of section 337 on Feb. 14, 2019. The FID found all the asserted claims except claim 19—claims 1, 15–18, 24, 26–28, 36, and 38—invalid. Specifically, the FID found that claims 1, 15, 16, 17, 18, 24, 26, 27, 28, 36, and 38 of the '693 patent are anticipated by the Bitelli SF 102 C machine, and claims 1, 15, 16, 17, 18, 24, 26, 27, 36, and 38 of the '693 patent are obvious in view of the Bitelli Volpe SF 100 T4M machine and U.S. Pat. No. 3,633,292 to Ulrich. FID at 84. The FID also found that the Wirtgen W 100 CFi, W 120 CFi, and W 130 CFi road milling machines (collectively, the "Series 1810" machines), infringe claim 19. Thus, the ALJ recommended that the Commission issue a limited exclusion order (LEO) and cease and desist order (CDO) against Wirtgen. The Commission affirmed the ALJ's determination in relevant part and issued the recommended LEO and CDO against Wirtgen's Series 1810 machines.

## II.     RELEVANT ITC FINDINGS

### A.     Customs accepts all legal and factual findings of the Commission

Section 337 tasks the Commission with determining the scope of asserted patent claims in order to determine whether imported articles infringe those claims. 19 U.S.C. § 1337(a)(1)(B). The Commission then may direct that "the articles concerned … be excluded from entry" and "notify the Secretary of the Treasury" who "shall, through the proper officers, refuse such entry." *Id.* at § 1337(d)(1). According to its statutory role, "CBP is bound by the ITC's findings as they relate to section 337 and shall refuse entry as directed." *See* 19 U.S.C. § 1337(d). CBP HQ Ruling H200715 at 8 (Oct. 23, 2013). Thus, Customs accepts all legal and factual findings of the Commission:

> we treat all determinations of the Commission, including any conclusion of law or finding of fact, that arise from an investigation or related proceeding, as binding authority, and we apply these determinations with preclusive effect.

CBQ HQ Ruling H295697 at 29 (July 20, 2018).

### B.     The Commission's legal and factual findings with respect to claim 19

The sole claim at issue, claim 19, depends from independent claim 17, which recites:

> 17. A method of controlling the position of at least one wheel or track of a plurality of wheels or tracks supporting a frame of a work machine, said at least one wheel or track being connected to a respective lifting column connected to said frame by a support arm, said lifting column being adapted to raise and lower said frame relative to the respective wheel or track, said method comprising the steps of:
>
> controllably actuating a first actuator to pivot said support arm relative to said frame to position said wheel or track between a projecting or retracted position relative to said frame, the projecting and retracted position forming an arc of at least 90°, and

controllably <u>actuating a second actuator to position said wheel or track</u> in a selected rotational direction about a vertical axis of said wheel or track.

'693 patent, 10:43-57 (emphasis added). Claim 19 adds the further limitation:

> 19. The method of claim 17, wherein <u>positioning</u> said wheel or track in said rotational direction includes <u>rotating said lifting column</u>.

*Id.* at 10:63-65. (emphasis added). The parties agreed that the term "rotating said lifting column" should be construed to mean "rotating at least a portion of said lifting column." Order No. 28 (*Markman* Order) at 13. The ALJ adopted that claim construction. *Id.*; Comm'n Op. at 18-19.

The ALJ further interpreted the scope of claim 19 to require rotational coupling of the lifting column and track in order to find the claim not anticipated by the Bitelli SF 102 C. An annotated photograph of the Bitelli SF 102 C, provided by Caterpillar's own expert and relied on in the FID, is reproduced below, and videos can be seen at RPX-0358C.mov; RPX-0519C.mov; RPX-0659C.mov. *See* FID at 35 (citing CDX-0003.30).



The FID found that the scope of claim 19 did not include the swing leg of the Bitelli SF 102 C because "rotating the yoke [of the SF 102 C] … does not rotate the lifting column." FID at 36. Specifically, although the steering cylinder (the "second actuator" of claim 17) positions the

3

track in a selected rotational direction about a vertical axis of the track, that action does not rotate a portion of the lifting column. Rather, it rotates a separate structure: the yoke that connects the track to the lifting column. Because the yoke is rotationally decoupled from the lifting column, the yoke and track rotate without rotating the lifting column. FID at 36.

> The yoke of the Bitelli SF 102 C is different from the bracket described in the '693 patent…. Unlike the coaxial sleeve and bracket claimed as part of the lifting column in the '693 patent, the yoke in the Bitelli SF 102 C is a distinct structure that rotates the tracks on a separate axis from the lifting column. *Rotating the yoke in the Bitelli SF 102 C does not rotate the lifting column, and accordingly, claim 19 is not anticipated.*

FID at 35-36 (emphasis added). This rotational decoupling is readily confirmed by visual inspection. As can be seen in RPX-0519C.mov, there is a keyway that runs vertically along the lifting column (the red line representing the axis of the lifting column in the annotated photograph above runs through the middle of that keyway). When the track is steered, the keyway remains in the same position relative to the frame, demonstrating that the lifting column does not rotate when the steering cylinder extends or retracts.

The ALJ's factual and legal findings regarding the scope of claim 19 in the invalidity context have preclusive effect in the infringement context. "[J]udicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity or infringement." *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983). This follows because both infringement and invalidity require first construing the claims and then comparing them to a reference, whether accused product or prior art. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316 (2015) ("Determining infringement requires two steps: construing the claims and comparing the properly construed claims to the accused product."); *Medichem, S.A. v. Rolabo S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) ("Both anticipation under § 102 and obviousness under § 103 are two-step inquiries . . . a proper construction of the claims … [and] a comparison of the properly construed claim to the prior art.")

Accordingly, if Customs finds that rotating the yoke of the XFi machine does not also rotate the lifting column, then Customs must also find that, like the Bitelli SF 102 C, the XFi machine is outside the scope of claim 19 and of the 1088 LEO.

## C. Rotating the Yoke of the Swing Leg of the XFi Machine Does Not Rotate the Lifting Column

The XFi machine is a road milling machine that grinds and removes an old layer of pavement in order to create a smooth and even surface on which to apply new pavement. A photograph of the XFi machine that Wirtgen will import is shown below.



lifting column

steering actuator

yoke

track

lifting column

steering actuator

yoke

track

direction of travel

As seen above, the XFi machine includes a milling drum located at the rear of the machine. The milling drum is covered with sharp bits that drill into the road surface as the drum rotates. *See* FID at 2-3. Tracks (yellow) propel the machine over the road surface. *See id.* A yoke connects each track to a lifting column that lowers and raises the machine frame to bring the milling drum into and out of contact with the road surface. *See id.* The front-left track and front-right track are steered by rotating the lifting column, thereby rotating the yoke and track connected thereto. But the rear-right track, or swing leg, is steered by rotating only the yoke and track, not the lifting column.

In addition, the swing leg can swing out from the frame of the machine as needed. *See id.* at 7-8. The photograph below shows the XFi machine with the swing leg in the extended position relative to the frame.



To permit milling close to an object like a highway barrier, curb, or wall (so-called "flush milling"), the swing leg can be retracted. The photograph below shows the XFi machine with the swing leg in the retracted position relative to the frame.



## III.    INFRINGEMENT ANALYSIS

Claim 19 requires that the swing leg actuate a second actuator to position the wheel or track in a selected rotational direction by rotating at least a portion of the lifting column. The FID expressly found that the prior-art Bitelli SF 102 C does not satisfy this limitation. FID at 34-36.

This finding applies to the XFi swing leg because it uses this design. Rotating the yoke in the XFi machine does not rotate the lifting column, and accordingly, does not infringe claim 19.

### 1. The Bitelli SF 102 C swing leg does not meet claim 19

Milling machines use various mechanisms to (1) pivot the swing leg between the extended and retracted positions and (2) rotate the track about a vertical axis. *See* FID at 7-12, 31, 35-38, 43-45, 48-49. Claim 17 of the '693 patent recites the steps of (1) "controllably actuating a first actuator to pivot [the swing leg] between a projecting or retracted position relative to said frame" and (2) "controllably actuating a second actuator to position said wheel or track in a selected rotational direction about a vertical axis of said wheel or track." Claim 19 further requires that in step (2), the positioning in said rotational direction "includes rotating said lifting column." The FID found that the scope of claim 19 did not include the swing leg of the Bitelli SF 102 C for which "rotating the yoke … does not rotate the lifting column." FID at 36.

### 2. The XFi machine incorporates the same features that the FID analyzed for the Bitelli SF 102 C machine

With respect to the elements of claim 19, the XFi machine swing leg is identical in structure and operation to the Bitelli SF 102 C swing leg. The steering cylinder is mounted between the lifting column and the yoke such that upon actuation it rotates only the yoke and associated track; it does not rotate the lifting column. In addition, the axis around which the track rotates is not coaxial with the axis of the lifting column. The ALJ found that these features brought the Bitelli SF 102 C machine outside of the scope of claim 19, and that finding applies to the XFi machine as well. FID at 34-36. The XFi machine does not practice the method of claim 19. Moreover, the Commission made this finding by adopting Caterpillar's arguments. *Id.* Accordingly, having persuaded the Commission that a yoke that rotates without rotating the lifting column in the SF 102 C ***does not*** satisfy claim 19, Caterpillar is precluded from arguing that this same setup in the XFi machine ***does*** satisfy claim 19. *See Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1353–54 (Fed. Cir. 2010) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

The prior design found to infringe claim 19 steered its swing-leg track via a hydraulic cylinder connected between the machine frame and a link-ring rotationally fixed to the lifting column, as shown in the computer model below. Consequently, actuation of the steering cylinder rotated a portion of the lifting column (shown in blue), thereby rotating the associated track. FID at 22. In other words, the track was rotationally coupled to the lifting column.



**Prior Design Swing Leg: Rotationally Coupled**

In contrast, the XFi machine, as depicted in the CAD drawings below, steers its swing-leg track via a hydraulic cylinder connected between the yoke and a plate fixed to the bottom of the lifting column, as shown in the next computer models. Consequently, actuation of the steering cylinder rotates only the yoke (shown in blue), not the lifting column, to rotate the associated track. When extended, the hydraulic cylinder pushes against the fixed plate, thereby rotating the yoke and attached track to steer the track to the left. When retracted, the hydraulic cylinder pulls against the fixed plate, thereby rotating the yoke and attached track to steer the track to the right. Actuation of the hydraulic cylinder does not rotate any portion of the lifting column. The track and the lifting column are rotationally decoupled.



**XFi Machine Swing Leg: Rotationally Decoupled**

Enclosed with this memo are photographs and videos of the XFi machine, serial number 18101069. They show that the yoke and the lifting column are rotationally decoupled; the lifting

column does not rotate when the track is steered by extension and retraction of the steering cylinder. *See*, *e.g.*, 1_side_wide.mp4; 2_side_tight.mp4; 3_angled_wide.mp4; 4_angled_tight.mp4; 5_elevated_wide.mp4; 6_elevated_tight.mp4.

The first two photographs (below) show the swing-leg in the retracted position[2] with the track steered to propel the machine straight ahead, i.e., with the track parallel to the frame. Two viewpoints are provided, one from the side and one from an elevated angle. Note that the lower portion of the lifting column includes a keyway. As will be seen, as the steering actuator rotates the yoke and the associated track, the keyway remains in the same position relative to the frame, indicating that the lifting column does not rotate when the steering actuator extends or retracts.



**7_side_tight_retracted_straight.JPG (annotated)**

---

[2] The XFi swing leg does not steer in the extended position.



**8_elevated_tight_retracted_straight.JPG (annotated)**

The next pair of photographs (below) shows the swing-leg in the retracted position with the track steered to the left by retracting the steering actuator. Although rotated only a few degrees, this represents the maximum steering angle in this direction. Note that the keyway has not changed position relative to the frame.



**9_side_tight_retracted_left.JPG (annotated)**



lifting column

keyway in lifting column

steering actuator

yoke

direction of travel

**10_elevated_tight_retracted_left.JPG (annotated)**

The next pair of photographs (below) shows the swing-leg in the retracted position with the track steered to the right. This represents the maximum steering angle in this direction. Note that, as with the straight and steered-left track positions, the keyway has not changed position relative to the frame.



lifting column

keyway in lifting column

steering actuator

yoke

direction of travel

**11_side_tight_retracted_right.JPG (annotated)**

12



The final set of six photographs below shows the series above, with the annotations removed. As can be seen, the keyway remains in the same location no matter whether the track is steered straight ahead, to the left, or to the right. This demonstrates that the rotation of the track is decoupled from the rotation of the lifting column.



| **Straight** | **Steering Left** | **Steering Right** |

The XFi machine incorporates structural changes that bring the machine outside the scope of claim 19. The design of the 1810 series that was found to infringe claim 19 utilized a steering cylinder extending from the frame to a steering ring rotationally fixed to the lifting column. The design of the XFi and the SF 102 C utilizes a steering cylinder extending from a plate fixed to the bottom of the lifting column to a non-coaxial yoke. By necessity, this design *rotationally decouples* the yoke from the lifting column, ensuring that the steering cylinder positions the track *without rotating* any portion of the lifting column. Accordingly, as the FID found, the design is outside the scope of claim 19.

## IV.    CONCLUSION

As set forth above, the Commission has already determined that a rotationally decoupled swing leg does not infringe claim 19 of the '693 patent. Wirtgen has enclosed photo and evidence for Customs to confirm that the swing leg is rotationally decoupled. The XFi machine is, therefore, outside of the scope of the 1088 LEO.

Sincerely,

COUNSEL FOR WIRTGEN GMBH, WIRTGEN GROUP HOLDING GMBH, AND WIRTGEN AMERICA, INC.

Daniel E. Yonan
Ralph W. Powers III
Dallin G. Glenn
STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC 20005
(202) 371-2600

Ryan D. Levy
Seth R. Ogden
PATTERSON INTELLECTUAL PROPERTY LAW, P.C.
Roundabout Plaza
1600 Division Street, Suite 500
Nashville, TN 37203
(615) 242-2400